FILED

2013 JUL 25  PM 4: 36

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2013 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>MOSHE MATSRI,<br>  aka "Jim,"<br>  aka "Moshe Hatadi,"<br>  aka "Moshe the Religious,"<br>YOUVAL GERINGER-GANOR,<br>  aka "Mike,"<br>  aka "The Disappointed One,"<br>YARON COHEN,<br>  aka "Mike,"<br>IBRAHIM OTER,<br>  aka "The Godfather,"<br>SHAY PANIRY,<br>  aka "Alex,"<br>  aka "Sacramento,"<br>HECTOR MIGUEL GOMEZ-NAVARRO,<br>NISAM SABAG,<br>  and<br>EFRAIN AISPURO, JR.,<br><br>        Defendants. | CR No 13- 0511<br><br>I N D I C T M E N T<br><br>[21 U.S.C. § 846: Conspiracy to<br>Aid and Abet the Distribution<br>of, Possess with Intent to<br>Distribute, and Attempt to<br>Distribute, Controlled<br>Substances; 18 U.S.C. § 1956(h):<br>Conspiracy to Launder Money;<br>18 U.S.C. §§ 1956(a)(2)(A),<br>(a)(2)(B)(i), (a)(3)(A),<br>(a)(3)(B): Laundering of<br>Monetary Instruments; 18 U.S.C.<br>§ 1951(a): Conspiracy and<br>Attempt to Interfere with<br>Commerce by Threats and<br>Violence; 18 U.S.C. § 2(a):<br>Aiding and Abetting] |

The Grand Jury charges:

COUNT ONE

[21 U.S.C. § 846]

A.   OBJECT OF THE CONSPIRACY

Beginning on an unknown date and continuing until on or about July 12, 2013, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious" ("MATSRI"), YOUVAL GERINGER-GANOR, aka "Mike," aka "The Disappointed One" ("GERINGER"), YARON COHEN, aka "Mike" ("COHEN"), IBRAHIM OTER, aka "the Godfather" ("OTER"), SHAY PANIRY, aka "Alex," aka "Sacramento" ("PANIRY"), HECTOR MIGUEL GOMEZ-NAVARRO ("GOMEZ-NAVARRO"), and EFRAIN AISPURO, JR. ("AISPURO"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally aid and abet the distribution of, and possess with intent to distribute, a controlled substance, that is, at least five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(ii), and 18 U.S.C. § 2(a).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished in substance as follows:

1     1.   Defendant COHEN would assist drug traffickers by
2  laundering their drug proceeds from Europe to the United States,
3  in exchange for a percentage of the drug proceeds.

4     2.   Defendant COHEN would assist drug traffickers by
5  offering to smuggle hundreds of kilograms of cocaine into Europe
6  using the Port of Rotterdam in the Netherlands and the Port of
7  Antwerp in Belgium as points of entry, in exchange for a
8  percentage of the amount of cocaine shipped.

9     3.   Defendant COHEN would arrange meetings for himself and
10  his drug trafficking associates to discuss the purchase of over
11  100 kilograms of cocaine, which would be concealed in shipping
12  containers and transported to Europe on cargo ships arriving
13  from South America.

14     4.   Defendant COHEN would introduce drug traffickers to
15  defendant MATSRI in order for MATSRI to assist the drug
16  traffickers in laundering their drug money.

17     5.   Defendants MATSRI, GERINGER, COHEN, and OTER would
18  receive hundreds of thousands of dollars of drug proceeds and
19  would launder the drug proceeds by utilizing a global network of
20  businesses, financial institutions, and co-conspirators to wire
21  transfer or otherwise remit the drug proceeds from foreign
22  countries to locations in the United States, as well as from one
23  state in the United States to another state in the United
24  States, in exchange for a percentage of the drug proceeds.

25     6.   Defendants MATSRI, GERINGER, and COHEN would assist a
26  drug trafficking organization by shipping or otherwise

27

28                               3

transmitting drug proceeds to Mexico and South America, in exchange for a percentage of the drug proceeds.

7. Defendants MATSRI, GERINGER, and COHEN would assist members of a drug trafficking organization by offering to transport bulk amounts of drug proceeds from Europe to South America using couriers or pilots based in Germany.

8. Defendants MATSRI, GERINGER, and COHEN would attempt to broker illegal drug deals involving cocaine, ecstasy, and heroin between drug suppliers and purchasers in the United States, Canada, Europe, and Mexico.

9. Defendant PANIRY would deliver drug proceeds in the form of bulk amounts of cash to drug traffickers.

10. Defendant PANIRY, at the direction of defendant MATSRI, would threaten, with physical violence, drug customers who owed money to their drug suppliers in order to intimidate the customers into paying their drug debts.

11. Defendant GOMEZ-NAVARRO, acting at the direction of defendants MATSRI and PANIRY, would vandalize property belonging to drug customers who owed a drug debt.

12. Defendant MATSRI would arrange for multiple kilograms of cocaine to be transported in vehicles equipped with a hidden compartment in exchange for the payment of $1,000 per kilogram that was to be transported.

13. Defendants PANIRY and AISPURO, acting on behalf of defendant MATSRI, would transport kilogram quantities of cocaine from California to Utah.

4

C.    OVERT ACTS

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendants MATSRI, GERINGER, COHEN, OTER, PANIRY, GOMEZ-NAVARRO, and AISPURO, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

**Defendant COHEN agrees to launder drug proceeds and offers to distribute cocaine and heroin in Europe**

1.    On November 13, 2012, using coded language during a telephone conversation, defendant COHEN, identifying himself as "Mike," offered to meet the following day in Amsterdam, the Netherlands, with an individual he believed was an international drug trafficker but who was, in fact, an undercover agent with the Drug Enforcement Administration (hereinafter "UC1") to discuss laundering what defendant COHEN believed to be the proceeds of UC1's cocaine trafficking (hereinafter "drug proceeds").

2.    On November 14, 2012, at a hotel in Amsterdam, the Netherlands, defendant COHEN agreed to launder approximately 70,000 Euros in drug proceeds (approximately $89,138 in U.S. currency) that he received from UC1 and a Dutch undercover law enforcement officer (hereinafter the "Dutch UC").

3.    On November 14, 2012, at a hotel in Amsterdam, the Netherlands, defendant COHEN offered to help UC1 smuggle multi-kilogram loads of cocaine into Europe using his connections at

the Port of Rotterdam in exchange for a percentage of the cocaine load.

4. On November 15, 2012, defendant COHEN caused to be wire transferred approximately $78,416 in laundered drug proceeds to a bank account in Los Angeles, California, using a bank account registered in Denmark.

5. On November 19, 2012, at a hotel in Amsterdam, the Netherlands, defendant COHEN told UC1 that he wanted to purchase cocaine from UC1 or trade heroin in exchange for cocaine, which he would resell in Europe at a price between 32,000 to 32,500 Euros (approximately $42,500 in U.S. currency) per kilogram.

6. On November 19, 2012, at a hotel in Amsterdam, the Netherlands, defendant COHEN received approximately 144,300 Euros (approximately $184,458 in U.S. currency) in drug proceeds from UC1 and the Dutch UC and agreed to launder the money to the United States by wire transfer.

7. On November 19, 2012, at a hotel in Amsterdam, the Netherlands, using coded language, defendant COHEN told UC1 that he had used an individual he identified as "the Rabbi" (hereinafter "co-conspirator #1") to launder the drug proceeds he received from UC1 and the Dutch UC on November 14, 2012, and would use a Pakistani business owner (hereinafter "co-conspirator #2"), who had access to an account belonging to a billionaire located in Dubai, to launder the drug proceeds that UC1 and the Dutch UC had just provided to him.

8. On November 22, 2012, using coded language during a telephone conversation, defendant COHEN told UC1 that in

addition to laundering drug proceeds from the Netherlands to Los Angeles for a seven-percent commission, he could wire transfer the drug proceeds to Colombia in exchange for a larger commission.

9.   On November 23, 2012, defendant COHEN caused to be wire transferred approximately $162,801 in laundered drug proceeds to a bank account in Los Angeles, California, using bank accounts registered in Hong Kong and Dubai.

**Defendants MATSRI, GERINGER, COHEN, and PANIRY agree to launder $75,000 in drug proceeds collected in New York**

10.   On November 27, 2012, using coded language during a telephone conversation, defendant COHEN discussed with UC1 different ways that he could assist UC1 launder drug proceeds from New York to Los Angeles and stated that he could charge a lower commission if UC1 assured him that there would be multiple opportunities in the future for COHEN and his associates to collect and launder drug proceeds for UC1.

11.   On November 29, 2012, using coded language during a telephone conversation, defendant COHEN told UC1 that his associate in the United States would contact UC1 later that day to discuss having UC1 launder drug proceeds from New York to Los Angeles in exchange for a six-percent commission.

12.   On November 29, 2012, using coded language during a telephone conversation, defendant MATSRI, identifying himself as "Jim," told UC1 that he was a friend of defendant COHEN's and sought to set up a meeting in downtown Los Angeles to discuss the laundering of what MATSRI believed to be the proceeds of UC1's cocaine trafficking (hereinafter "drug proceeds").

13.   On December 4, 2012, using coded language during a telephone conversation, defendant COHEN told UC1 that the price for smuggling a load of cocaine into the Port of Rotterdam would be between 25 and 30 percent of the cocaine load and that UC1 should come to Europe to meet COHEN's associates who had connections who worked at the port to discuss the details in person.

14.   On December 4, 2012, using coded language during a telephone conversation, defendant COHEN told UC1 that defendant MATSRI could be trusted to launder drug proceeds successfully from New York to Los Angeles.

15.   On December 5, 2012, at a restaurant in Los Angeles, California, using coded language, defendant MATSRI met with UC1 and UC1's associate, who defendant MATSRI believed was a Los Angeles-based cocaine trafficker but who was, in fact, an undercover police officer (hereinafter "UC2").   During the course of the meeting, using coded language, MATSRI asked UC1 and UC2 how frequently they would need drug proceeds laundered and how much money would be involved.

16.   On December 5, 2012, at a restaurant in Los Angeles, California, using coded language, defendant MATSRI told UC1 and UC2 that he would launder their drug proceeds to Los Angeles using a network of Jewish associates located in New York City in exchange for a total commission of six percent that would be shared by defendants MATSRI and COHEN and their associates.

17.   On December 5, 2012, at a restaurant in Los Angeles, California, using coded language, defendant MATSRI told UC1 and

UC2 that his organization was able to launder drug proceeds within the United States and from Canada and Europe to the United States, Mexico, and various countries in South America.

18.  On the morning of December 7, 2012, using coded language during a telephone conversation, defendant MATSRI confirmed that he would meet UC1 later that day to continue discussing defendant MATSRI's offer to launder drug proceeds both within the United States and internationally.

19.  On December 7, 2012, at a coffee shop in Los Angeles, California, using coded language, defendant MATSRI confirmed to UC1 and UC2 that he would launder drug proceeds from New York to Los Angeles in exchange for a total commission of six percent that would be shared by MATSRI and his associates, and told UC1 and UC2 that defendant GERINGER in New York would take the drug proceeds they collected for UC1 and UC2 to a safe location.

20.  On December 7, 2012, at a coffee shop in Los Angeles, California, using coded language, defendant MATSRI told UC1 and UC2 that he would change his telephone number each time he completed a money laundering transaction with them.

21.  On December 9, 2012, using coded language during a telephone conversation, defendant MATSRI provided UC2 with a new telephone number that MATSRI had acquired for their pending money laundering transaction and told UC2 that he would provide him with the telephone number for his associate, defendant GERINGER, who he identified as "Mike," when UC2 arrived in New York to conduct the money laundering transaction.

1     22.  On December 10, 2012, using coded language during a

2  telephone conversation, defendant COHEN discussed the details of

3  the New York to Los Angeles money laundering transaction that he

4  and defendant MATSRI had agreed to conduct; and COHEN also

5  reiterated his desire to arrange a meeting between UC1 and his

6  connections at the Port of Rotterdam to negotiate shipping loads

7  of cocaine to the Netherlands.

8     23.  On December 13, 2012, in a coded electronic message,

9  defendant COHEN told UC1 that defendant MATSRI was waiting to

10  receive the drug proceeds that MATSRI and COHEN had agreed to

11  launder.

12     24.  On December 13, 2012, using coded language during a

13  telephone conversation, defendant MATSRI told UC1 that he had

14  acquired a new telephone number in preparation for the impending

15  money laundering transaction and asked UC1 when UC1 would be

16  ready to provide drug proceeds in New York that his associate

17  could collect and launder.

18     25.  On December 17, 2012, using coded language during a

19  telephone conversation, defendant MATSRI confirmed to UC2 that

20  defendant GERINGER, using the alias "Mike," was MATSRI's

21  associate who would assist MATSRI in laundering drug proceeds

22  from New York to Los Angeles.

23     26.  On December 17, 2012, at a restaurant in New York

24  City, New York, using coded language, defendant GERINGER told

25  UC2 and UC2's associate, who defendant GERINGER believed was a

26  cocaine trafficker but who was, in fact, an undercover agent

27  with the Drug Enforcement Administration (hereinafter "UC3"),

28

1  that he liked to change telephone numbers every two days after

2  he completed a money laundering transaction to avoid law

3  enforcement detection and warned that there was a lot of law

4  enforcement activity in New York.

5      27.  On December 17, 2012, at a restaurant in New York

6  City, New York, using coded language, defendant GERINGER told

7  UC2 and UC3 that he could provide the equivalent of the amount

8  of what GERINGER believed to be the proceeds of the UCs' drug

9  trafficking (hereinafter "drug proceeds") he received in New

10  York, minus the commission, in cash in Los Angeles within an

11  hour of his receipt of the drug proceeds.

12      28.  On December 17, 2012, at a restaurant in New York

13  City, New York, using coded language, defendant GERINGER told

14  UC2 and UC3 that he could launder drug proceeds collected in

15  Canada and Europe and that he knew a pilot based in Germany who

16  would transport drug proceeds from Europe to Chile and to Peru.

17      29.  On December 18, 2012, using coded language during a

18  telephone conversation, defendant MATSRI discussed with UC1

19  whether the drug proceeds collected by defendant GERINGER in New

20  York would be available to UC1 in Los Angeles the same day

21  GERINGER received the drug proceeds.

22      30.  On December 19, 2012, using coded language during a

23  telephone conversation, defendant MATSRI arranged to meet with

24  UC1 later that day to coordinate the laundering of the drug

25  proceeds that defendant GERINGER would receive in New York later

26  that day.

27

28
                    11

1     31.  On December 19, 2012, at a restaurant in New York

2   City, New York, defendant GERINGER received approximately

3   $75,000 in drug proceeds from UC3 and, using coded language,

4   told UC3 that he would transfer the drug proceeds from UC3's bag

5   to GERINGER's gym bag in the bathroom to avoid drawing suspicion

6   by leaving the restaurant with a different bag than the bag he

7   had carried into the restaurant.

8     32.  On December 19, 2012, at a coffee shop in Los Angeles,

9   California, using coded language, defendant MATSRI told UC1 that

10  because the commission of six percent earned for laundering the

11  $75,000 in drug proceeds equaled $4,500, one of his associates

12  would deliver approximately $70,000 in cash to UC1's driver

13  (hereinafter "UC4") at a location in downtown Los Angeles.

14    33.  On December 19, 2012, at a coffee shop in Los Angeles,

15  California, using coded language, defendant MATSRI told UC1 that

16  he had access to a real estate company that could be used to

17  wire transfer funds in future transactions to disguise the

18  source of the drug proceeds being transferred.

19    34.  On December 19, 2012, at a coffee shop in Los Angeles,

20  California, using coded language, defendant MATSRI told UC1 that

21  defendant GERINGER and he would be changing telephone numbers

22  after their money laundering transaction concluded and that UC1

23  should call MATSRI from a pay phone to receive the new telephone

24  number that MATSRI would begin using the following day.

25    35.  On December 19, 2012, at a coffee shop in Los Angeles,

26  California, defendant MATSRI provided UC1 with $500 in cash as a

27

28

1    portion of the drug proceeds that defendants MATSRI, GERINGER,

2    and COHEN had agreed to launder.

3        36.   On December 19, 2012, at a coffee shop in Los

4    Angeles, California, defendant MATSRI provided UC1 with the

5    telephone number for defendant PANIRY, who MATSRI identified as

6    "Alex," so that PANIRY could deliver approximately $70,000 in

7    cash consisting of laundered drug proceeds to UC4.

8        37.   On December 19, 2012, using coded language during a

9    telephone call, defendant PANIRY directed UC4 to meet him

10   outside of a coffee shop in Los Angeles, California, so that he

11   could provide UC4 with approximately $70,000 in what PANIRY

12   believed to be the proceeds of the UCs' drug trafficking

13   (hereinafter "drug proceeds").

14       38.   On December 19, 2012, defendants MATSRI and PANIRY

15   drove to a coffee shop in Los Angeles, California, to deliver

16   approximately $70,000 in cash to UC4.

17       39.   On December 19, 2012, in front of a coffee shop in Los

18   Angeles, California, defendant PANIRY delivered a black, plastic

19   bag containing approximately $70,010 in drug proceeds to UC4 and

20   told UC4 that the bag contained $20 and $5 dollar bills.

21       40.   On December 19, 2012, using coded language during a

22   telephone conversation, defendant MATSRI asked UC1 if UC1 was

23   satisfied with the money laundering service defendants MATSRI,

24   GERINGER, COHEN, and PANIRY had provided that day.

25       41.   On December 19, 2012, using coded language during a

26   telephone conversation, defendant MATSRI asked UC1 if UC1 had

27   counted the money that defendants MATSRI and PANIRY had provided

28

                                   13

1   earlier that day and reminded UC1 that MATSRI could use real

2   estate companies to wire transfer drug proceeds in future

3   transactions to make those transactions appear to be legitimate

4   business transactions.

**Defendant MATSRI discusses his prior drug trafficking
activities and asks UC1 to extort a Mexican businessman
who owes MATSRI money**

7   42.  On January 10, 2013, at a restaurant in Los Angeles,

8   California, using coded language, defendant MATSRI told UC1 that

9   he had been selling cocaine and/or ecstasy since the age of 17.

10   43.  On January 10, 2013, at a restaurant in Los Angeles,

11   California, using coded language, defendant MATSRI told UC1 that

12   three or four years ago he partnered with a Mexican drug

13   trafficker to smuggle 300 kilograms of cocaine from Ecuador to

14   the Netherlands, but the cocaine had been stolen and never

15   arrived in Europe.

16   44.  On January 10, 2013, at a restaurant in Los Angeles,

17   California, using coded language, defendant MATSRI asked UC1 if

18   UC1 would threaten or, if necessary, murder a business owner in

19   Guadalajara, Mexico, who owed $70,000 to MATSRI so that people

20   would realize that MATSRI would not tolerate people who owed him

21   money but would not pay.

22   45.  On January 11, 2013, using coded language during a

23   telephone conversation, defendant MATSRI again asked UC1 if UC1

24   would assist him in threatening or physically harming the

25   business owner in Guadalajara, Mexico, who owed MATSRI $70,000.

26   46.  On January 23, 2013, using coded language during a

27   telephone conversation, defendant MATSRI again asked UC1 whether

28

1  UC1 knew anyone with contacts in Guadalajara, Mexico, who would

2  assist MATSRI in threatening or physically assaulting the

3  business owner in Guadalajara, Mexico, who owed MATSRI $70,000.

4  **Defendants MATSRI and GERINGER agree to launder $250,000
in drug proceeds collected in New York**

5

6  47.  On January 23, 2013, using coded language during a

7  telephone conversation, defendant MATSRI told UC1 that he would

8  give defendant GERINGER the bank account information UC1 had

9  provided to MATSRI so that drug proceeds laundered for UC1 could

10  be deposited into the account in a subsequent transaction.

11  48.  On January 24, 2013, using coded language during a

12  telephone conversation, defendant GERINGER agreed to launder

13  $250,000 in drug proceeds from New York City and told UC1 that

14  he would be able to wire transfer the drug proceeds to Los

15  Angeles within 48 hours.

16  49.  On January 24, 2013, using coded language during a

17  telephone conversation, defendant GERINGER told UC1 that he and

18  defendant MATSRI were partners who together could launder drug

19  proceeds collected in New York, Chicago, Miami, Germany, Italy,

20  and Spain.

21  50.  On January 24, 2013, using coded language during a

22  telephone conversation, defendant GERINGER told UC1 that he

23  could launder drug proceeds from Canada and that it was easier

24  for him to do so from Toronto or Quebec than from Vancouver.

25  51.  On January 25, 2013, using coded language during a

26  telephone conversation, defendant GERINGER told UC1 that he

27  could launder drug proceeds to Colombia but that it would be

28  more expensive than laundering drug proceeds domestically.

52.  On January 28, 2013, using coded language during a telephone conversation, defendant GERINGER agreed to meet UC2 at a diner in New York City, New York, to discuss the impending money laundering transaction involving $250,000 in drug proceeds.

53.  On January 28, 2013, at a diner in New York City, New York, using coded language, defendant GERINGER told UC2 how much he charged for laundering drug proceeds to different countries in South America and agreed to launder $250,000 for UC2 from New York to Los Angeles.

54.  On January 28, 2013, at a café in New York City, New York, defendant GERINGER received approximately $150,000 in drug proceeds from UC3.

55.  On January 28, 2013, using coded language during a telephone conversation, defendant MATSRI confirmed to UC1 that he had provided defendant GERINGER with the bank account information to which the drug proceeds GERINGER had collected from UC3 should be wire transferred.

56.  On January 29, 2013, using coded language during a telephone conversation, defendant GERINGER told UC1 that he would be using a European business account to wire transfer the drug proceeds that GERINGER had collected from UC3 the previous day.

57.  On January 29, 2013, at a café in New York City, New York, defendant GERINGER received approximately $100,000 in drug proceeds from UC3.

1    58.   On January 29, 2013, using coded language during a

2 telephone conversation, defendant GERINGER told UC2 that he

3 wanted to meet with UC2 to discuss the amount of money that had

4 been provided to him over the past two days.

5    59.   On January 29, 2013, using coded language during a

6 telephone conversation, defendant MATSRI told UC1 that defendant

7 GERINGER most likely was not answering his telephone because he

8 was traveling in a subway and did not have reception but would

9 call UC2 back when he had reception.

10    60.   On January 29, 2013, at a restaurant in New York City,

11 New York, using coded language, defendant GERINGER told UC2 that

12 he believed law enforcement had been following him, but that he

13 had eluded them by engaging in counter-surveillance measures.

14    61.   On January 29, 2013, at a restaurant in New York City,

15 New York, using coded language, defendant GERINGER told UC2 that

16 his associate, a pilot in Frankfurt, Germany, would be willing

17 to transport cocaine from Colombia to Germany and would fly the

18 drug proceeds generated from the sale of the cocaine back to

19 Colombia.

20    62.   On January 29, 2013, at a restaurant in New York City,

21 New York, defendant GERINGER told UC2 that he would use coded

22 language in telephone calls to relay to UC2 any new telephone

23 number that he obtained after dropping his current telephone at

24 the conclusion of their latest money laundering transaction.

25    63.   On February 1, 2013, defendant GERINGER caused to be

26 wire transferred approximately $83,140 in laundered drug

27

28
                                    17

proceeds to a bank account in Los Angeles, California, using a bank account registered in Cyprus.

64. On February 4, 2013, using coded language during a telephone conversation, defendant MATSRI told UC2 that another portion of the drug proceeds collected by defendant GERINGER would be wire transferred the following day.

65. On February 4, 2013, using coded language during a telephone conversation, defendant MATSRI asked UC2 whether there would be additional drug proceeds for defendant GERINGER to launder that week.

66. On February 5, 2013, using coded language during a telephone conversation, defendant GERINGER asked UC2 whether UC2 had additional drug proceeds for him to launder and told UC2 that the second wire transfer of the drug proceeds collected by him the previous week should arrive in UC2's bank account that night.

67. On February 5, 2013, defendant GERINGER caused to be wire transferred approximately $49,982 in laundered drug proceeds to a bank account in Los Angeles, California, using a bank account registered in Canada.

68. On February 6, 2013, using coded language during a telephone conversation, defendant MATSRI told UC2 that he would contact defendant GERINGER to verify the status of the remainder of the drug proceeds left to be wire transferred by GERINGER.

69. On February 7, 2013, defendant GERINGER caused to be wire transferred approximately $101,860 in laundered drug

1    proceeds to a bank account in Los Angeles, California, using a

2    bank account registered in the Marshall Islands.

**Defendants MATSRI and GERINGER agree to launder 200,000 Canadian dollars in drug proceeds collected in Vancouver, Canada**

5    70.   On January 31, 2013, using coded language during a

6    telephone conversation, defendant GERINGER told UC1 that he

7    would meet UC1 at a restaurant in Richmond, British Colombia,

8    Canada.

9    71.   On January 31, 2013, at a restaurant in Vancouver,

10   Canada, using coded language, defendant GERINGER agreed to

11   launder 200,000 in Canadian dollars (approximately $198,740 in

12   U.S. currency) and told UC1 and an individual GERINGER believed

13   was a cocaine customer of UC1 but who was, in fact, a Canadian

14   undercover officer (hereinafter "the Canadian UC"), that he

15   would charge a smaller commission if the drug proceeds could be

16   brought to him in Toronto or Montreal because he had an

17   established network of Israeli businesspeople in those cities

18   who would help him launder the money.

19   72.   On January 31, 2013, using coded language during a

20   telephone conversation, defendant GERINGER called defendant

21   MATSRI to discuss the commission MATSRI and GERINGER would

22   charge UC1 and the Canadian UC to launder drug proceeds from

23   Vancouver, Canada, to the United States.

24   73.   On February 8, 2013, using coded language during a

25   telephone conversation, defendant GERINGER told UC1 that

26   defendant MATSRI and he could be trusted to launder drug

27

28                                  19

1  proceeds for UC1 throughout the United States, Canada, and
2  Europe.

3      74.  On February 14, 2013, using coded language during a
4  telephone conversation, defendant GERINGER told UC1 that he
5  would meet with the Canadian UC the following day to arrange the
6  money laundering transaction and would contact defendant MATSRI
7  to confirm the meeting.

8      75.  On February 14, 2013, using coded language during a
9  telephone conversation, defendant MATSRI agreed to meet UC1 the
10  following day to coordinate the laundering of drug proceeds that
11  would be collected by defendant GERINGER in Vancouver, Canada,
12  the following day.

13      76.  On February 15, 2013, at a coffee shop in Los Angeles,
14  California, defendant MATSRI met with UC1 to coordinate the
15  laundering of drug proceeds that would be collected by defendant
16  GERINGER in Vancouver, Canada, later that day.

17      77.  On February 15, 2013, at a bakery located in
18  Vancouver, Canada, using coded language, defendant GERINGER
19  quoted the Canadian UC a higher commission than initially agreed
20  upon to transfer the drug proceeds to Los Angeles, California.

21      78.  On February 15, 2013, using coded language during a
22  telephone conversation, defendant MATSRI discussed with
23  defendant GERINGER the commission they would charge to launder
24  drug proceeds from Vancouver, Canada, to Los Angeles,
25  California.

26      79.  On February 15, 2013, at a coffee shop in Los Angeles,
27  California, defendant MATSRI told UC1 that he would put UC1 in

28
                                20

1    contact with a drug trafficker who would distribute ecstasy in
2    Vancouver, Canada.

3        80.   On February 15, 2013, at a coffee shop in Los Angeles,
4    California, using coded language, defendant MATSRI told UC1 that
5    he would pay UC1 the difference between the initially agreed-
6    upon commission and the commission defendant GERINGER was now
7    demanding for the impending money laundering transaction.

8        81.   On February 15, 2013, at a bakery located in
9    Vancouver, Canada, defendant GERINGER received approximately
10   100,000 Canadian dollars in drug proceeds to be laundered to Los
11   Angeles, California.

12       82.   On February 15, 2013, at a coffee shop in Los Angeles,
13   California, defendant MATSRI provided $1,000 in cash to UC1 as a
14   portion of the laundered drug proceeds that had been collected
15   by defendant GERINGER in Vancouver, Canada.

16       83.   On February 15, 2013, in the parking lot of a coffee
17   shop in Los Angeles, California, defendant PANIRY delivered a
18   grey shopping bag containing approximately $80,000 in laundered
19   drug proceeds to UC4 and told UC4 that he had an additional
20   $4,000, which he then provided to UC4 in an unbundled stack of
21   cash.

22       84.   On February 15, 2013, using coded language during a
23   telephone conversation, defendant GERINGER told the Canadian UC
24   that he was at a bank and would call the Canadian UC back to
25   arrange to pick up an additional 100,000 Canadian dollars to
26   facilitate the money laundering transaction that had been
27   previously negotiated.

28

85.   On February 15, 2013, in a bakery located in Vancouver, Canada, defendant GERINGER received approximately 100,000 Canadian dollars in drug proceeds that he agreed to wire transfer to Los Angeles, California.

86.   On February 22, 2013, using coded language during a telephone conversation, defendant MATSRI told UC2 that the drug proceeds collected by defendant GERINGER would be wire transferred into UC1 and UC2's bank account in Los Angeles, California, later that day.

87.   On February 22, 2013, defendant GERINGER caused to be wire transferred approximately $87,500 in laundered drug proceeds to a bank account in Los Angeles, California, using a bank account registered in Cyprus.

**Defendants COHEN and OTER discuss drug trafficking and money laundering business ventures and agree to launder 185,990 Euros in drug proceeds collected in the Netherlands**

88.   On February 22, 2013, in a coded electronic message, defendant COHEN agreed to introduce UC1 to COHEN's drug trafficking and money laundering associates operating in the Netherlands and Belgium to discuss smuggling cocaine loads in excess of 100 kilograms into Europe using cargo ships that would travel to Europe from ports in South America.

89.   On February 25, 2013, at a hotel in Amsterdam, the Netherlands, defendant COHEN and his associate, who paid customs inspectors and crew members that offload containers from ships to facilitate the importation of cocaine into Europe (hereinafter "co-conspirator #3"), offered UC1 two different ways to smuggle cocaine into Europe from Brazil, Colombia, and

22

1  Panama, using either the Port of Rotterdam in the Netherlands or
2  the Port of Antwerp in Belgium as points of entry, in exchange
3  for 20 to 30 percent of the cocaine load for which they would
4  arrange delivery.
5       90.  On February 25, 2013, at a hotel in Amsterdam, the
6  Netherlands, defendant COHEN offered to sell heroin to UC1 and
7  the Dutch UC and agreed to meet them the following day to
8  receive drug proceeds from the sale of cocaine for the purpose
9  of laundering the money for delivery in Los Angeles, California.
10      91.  On February 26, 2013, at a hotel in Amsterdam, the
11 Netherlands, defendant COHEN directed a courier (hereinafter
12 "co-conspirator #4") to collect approximately 185,990 Euros
13 (approximately $242,716 in U.S. currency) in drug proceeds from
14 UC1 and the Dutch UC and told UC1 that he would wire transfer
15 the funds to UC1's bank account in exchange for a seven-percent
16 commission.
17      92.  On February 26, 2013, at a hotel in Amsterdam, the
18 Netherlands, using coded language, defendant COHEN introduced
19 defendant OTER to UC1 as "the Godfather" of Israeli organized
20 crime in Belgium and the Netherlands.
21      93.  On February 26, 2013, at a hotel in Amsterdam, the
22 Netherlands, defendant COHEN and co-conspirator #3 discussed
23 purchasing a load of between 100 and 200 kilograms of cocaine to
24 be shipped to the Port of Amsterdam in the Netherlands.
25      94.  On February 26, 2013, at a restaurant in Amsterdam,
26 the Netherlands, using coded language, defendants COHEN and OTER
27 discussed cocaine trafficking with UC1 and told UC1 that
28

1   defendant COHEN's prior money laundering activities with UC1 had

2   been done with defendant OTER's knowledge and approval.

3       95.   On February 26, 2013, at a restaurant in Amsterdam,

4   the Netherlands, using coded language, defendant OTER told UC1

5   that he looked forward to working with UC1 on more drug and

6   money laundering deals in the future.

7       96.   On March 1, 2013, defendant COHEN caused to be wire

8   transferred approximately $216,435 in laundered drug proceeds to

9   a bank account located in Los Angeles, California, using a bank

10  account registered in Switzerland.

11      **Defendants MATSRI, GERINGER, COHEN and OTER discuss future**
    **drug trafficking deals and agree to launder drug proceeds**
12  **from Belgium to the United States**

13      97.   On March 5, 2013, using coded language during a

14  telephone conversation, defendant MATSRI told UC2 that he would

15  meet with UC1 and UC2 the following day to discuss future drug

16  and money laundering transactions.

17      98.   On March 6, 2013, in the parking lot of a restaurant

18  in Vernon, California, using coded language, defendant MATSRI

19  told UC1 and UC2 that he was in charge of negotiating the price

20  that would be paid to the pilot based in Frankfurt, Germany, who

21  defendant GERINGER had offered as someone who would transport

22  cocaine and drug proceeds (hereinafter "co-conspirator #5")

23  between Europe and South America.

24      99.   On March 16, 2013, in a coded electronic message,

25  defendant GERINGER told UC1 that he would charge an eight-

26  percent commission for transferring drug proceeds from Belgium

27  to Los Angeles, California.

28

1     100. On March 16, 2013, in a coded electronic message,

2  defendant GERINGER told UC1 that co-conspirator #5 wanted to

3  meet with UC1 to discuss transporting loads of cocaine from

4  South America to Europe.

5     101. On March 18, 2013, using coded language during a

6  telephone conversation, defendant MATSRI discussed with UC1 an

7  impending trip in which defendants GERINGER and COHEN would

8  collect drug proceeds in Belgium and transfer the money to Los

9  Angeles, California.

10     102. On March 19, 2013, in a coded electronic message,

11  defendant GERINGER confirmed with UC1 that he would meet UC1 in

12  Belgium to collect drug proceeds that needed to be laundered

13  from Europe.

14     103. On March 19, 2013, in a coded electronic message,

15  defendant COHEN confirmed with UC1 that he would meet UC1 in

16  Europe to discuss future drug deals.

17     104. On March 21, 2013, at a hotel in Brussels, Belgium,

18  defendant GERINGER agreed to launder approximately $140,000 in

19  drug proceeds for UC1.

20     105. On March 21, 2013, at a hotel in Brussels, Belgium,

21  defendant GERINGER told UC1 and an individual GERINGER believed

22  was a cocaine customer of UC1 but who was, in fact, an

23  undercover Belgian police officer (hereinafter "the Belgian

24  UC"), that they should create a company with a name involving

25  diamonds or jewelry because law enforcement would not

26  investigate financial transactions between diamond dealers and

27

28

1  GERINGER intended to use Jewish diamond dealers in Belgium to
2  launder the money to Los Angeles, California.

3      106. On March 21, 2013, at a hotel in Brussels, Belgium,
4  defendant GERINGER told UC1 that co-conspirator #5 would
5  transport cocaine via airplane from locations in South America
6  to Europe, but that it would cost more than shipping by boat
7  because the cocaine would have to be molded to fit into the
8  airplane's compartments.

9      107. On March 21, 2013, in a coded electronic message,
10  defendant COHEN told UC1 that he would meet UC1 at a restaurant
11  in Antwerp, Belgium, the following day to discuss future drug
12  and money laundering transactions.

13      108. On March 22, 2013, in Antwerp, Belgium, defendant
14  GERINGER received approximately $140,000 in drug proceeds from
15  the Belgian UC to be laundered to Los Angeles, California.

16      109. On March 22, 2013, at a restaurant in Antwerp,
17  Belgium, defendants COHEN and OTER discussed cocaine trafficking
18  in different parts of the world and agreed to launder
19  approximately $160,000 in drug proceeds on behalf of UC1.

20      110. On March 22, 2013, at a restaurant in Antwerp,
21  Belgium, defendant OTER told UC1 that he would leave the
22  restaurant early with what OTER believed to be the proceeds of
23  UC1's cocaine trafficking (hereinafter "drug proceeds") to avoid
24  being stopped by police officers looking for drunk drivers while
25  transporting the money.

26      111. On March 22, 2013, at a restaurant in Antwerp,
27  Belgium, defendant COHEN asked UC1 to sell him 50 kilograms of

28

cocaine that he would resell to drug customers who would ship the cocaine to the United Kingdom concealed in sailing boats.

112. On March 22, 2013, in Antwerp, Belgium, defendant OTER received approximately $160,000 in drug proceeds from the Belgian UC to be wire transferred by defendants COHEN and OTER to a bank account in Los Angeles, California.

113. On March 24, 2013, in a coded electronic message, defendant COHEN asked UC1 for account information for the bank account in Los Angeles, California, to which he would transfer the drug proceeds collected by defendant OTER on March 22, 2013.

114. On March 26, 2013, in coded language during a telephone conversation, defendant GERINGER told UC1 that he would meet with UC2 later that week to deliver the drug proceeds that he had collected in Belgium on March 22, 2013, minus defendant MATSRI and his commission for laundering the drug proceeds.

115. On March 29, 2013, using coded language during a Skype conversation, defendant GERINGER told UC1 that he would contact UC2 to arrange for the delivery of approximately $128,100 in cash to UC2.

116. On March 29, 2013, at a warehouse in San Dimas, California, defendant GERINGER provided UC2 with approximately $128,100 in laundered drug proceeds.

117. On March 29, 2013, at a warehouse in San Dimas, California, defendant GERINGER told UC2 that he would attempt to broker cocaine transactions between UC2 and his drug trafficking

1  associates who operated in different cities in the United

2  States.

3      118. On April 9, 2013, defendants COHEN and OTER caused to

4  be wire transferred approximately $141,740 in laundered drug

5  proceeds to a bank account in Los Angeles, California, using two

6  bank accounts registered in Switzerland and Panama.

7      119. On April 10, 2013, using coded language during a

8  telephone conversation, defendant COHEN explained to UC1 that

9  there had been a delay in wire transferring the drug proceeds to

10 Los Angeles, California.

11     120. On April 10, 2013, using coded language during a

12 telephone conversation, defendant COHEN told UC1 that his

13 associate, co-conspirator #3, had been involved in a shipment of

14 350 kilograms of cocaine destined for the Netherlands that had

15 been seized by law enforcement on a cargo ship docked in Santa

16 Marta, Colombia.

17     121. On April 16, 2013, in a coded electronic message,

18 defendant COHEN asked UC1 whether UC1 had received the wire

19 transfer of the drug proceeds defendants COHEN and OTER had

20 collected in Antwerp, Belgium, on March 22, 2013.

21     **Defendants MATSRI, GERINGER, PANIRY, GOMEZ-NAVARRO, and**
   **AISPURO continue to facilitate drug trafficking activity**

22

23     122. On April 3, 2013, using coded language during a

24 telephone conversation, defendant GERINGER asked UC2 for a

25 sample of cocaine to show prospective customers who were

26 interested in purchasing between five and 10 kilograms of

27 cocaine.

28

123. On April 3, 2013, using coded language during a telephone conversation, defendant GERINGER told UC2 that the cocaine for the transaction he was brokering had to be high quality.

124. On April 5, 2013, using coded language during a telephone conversation, defendant GERINGER reminded UC2 that the cocaine for the transaction he was brokering had to be high quality because the customers were close friends.

125. On April 5, 2013, using coded language during a telephone conversation, defendant GERINGER asked UC2 to meet with him to discuss the cocaine deal he was attempting to broker.

126. On April 16, 2013, at a restaurant in Los Angeles, California, using coded language, defendant GERINGER told UC1 that defendant MATSRI was the head of the organization in Los Angeles, California, and could help UC1 with any problems UC1 had in the area. When UC1 asked defendant GERINGER what kind of help defendant MATSRI could provide, defendant GERINGER made a punching motion with his hand which UC1 understood to mean that defendant MATSRI would use physical violence to assist UC1 in his drug trafficking activities.

127. On May 2, 2013, at a fast food restaurant in Los Angeles, California, using coded language, defendant MATSRI told UC1 and UC2 that he would be able to assist UC1 and UC2 by collecting any debts owed by drug customers through threats and acts of physical violence.

128. On May 7, 2013, using coded language during a telephone conversation, defendant COHEN discussed past money laundering transactions with UC1 and asked UC1 when UC1 would travel to Europe to provide defendant COHEN with more drug proceeds to launder.

129. On May 7, 2013, using coded language during a telephone conversation, defendant MATSRI told UC1 that he had dropped his old telephone, had a new telephone number, and asked UC1 when UC1 would meet with defendant COHEN in Europe to conduct a future money laundering transaction.

130. On May 10, 2013, using coded language during a telephone conversation, defendant GERINGER told UC1 that he uses businesses located in major financial centers to launder drug proceeds and agreed to meet UC1 in Belgium to discuss future drug and money laundering transactions.

131. On May 29, 2013, using coded language during a telephone conversation, defendant MATSRI told UC1 that he would ask his associates if they had a vehicle with a hidden compartment in it to transport a concealed load of cocaine from Montebello, California, to Dallas, Texas.

132. On June 5, 2013, in the parking lot of a shopping mall in Montebello, California, defendant MATSRI inspected the hidden compartment of a vehicle that he believed would be used to transport kilogram quantities of cocaine.

133. On June 20, 2013, using coded language during a telephone conversation, defendant MATSRI told defendant COHEN

1  that he met with UC1 and that UC1 would meet defendant COHEN in
2  Amsterdam the following week.

3      134. On July 8, 2013, using coded language during a
4  telephone call, defendant MATSRI agreed to meet UC2 later that
5  day to provide UC2 with the telephone number for a driver to
6  transport five kilograms of cocaine from the Los Angeles area to
7  St. George, Utah.

8      135. On July 8, 2013, at a shopping mall in Montebello,
9  California, using coded language, defendant MATSRI told UC2 that
10  he had arranged for a driver to transport five kilograms of
11  cocaine from the Los Angeles area to Utah.

12      136. On July 8, 2013, at a shopping mall in Montebello,
13  California, defendant MATSRI told UC2 that he would threaten an
14  individual who defendant MATSRI believed was a drug customer who
15  owed a debt to UC2 (hereinafter the "drug customer") by
16  vandalizing the drug customer's vehicle and placing a telephone
17  call to the drug customer threatening physical violence if the
18  customer did not pay for the cocaine.

19      137. On July 8, 2013, defendants MATSRI and PANIRY drove to
20  an apartment complex located in Toluca Lake, California, to
21  scout the location where they believed the drug customer's
22  vehicle would be located.

23      138. On July 9, 2013, using coded language during a
24  telephone conversation, defendant AISPURO agreed to meet later
25  that day with UC2 at a parking lot in Rancho Cucamonga,
26  California.

27

28

1    139. On July 9, 2013, using coded language during a

2  telephone conversation, defendant MATSRI provided defendant

3  PANIRY with information that would allow defendant PANIRY to

4  identify, in order to vandalize, the vehicle of the drug

5  customer that UC2 told defendant MATSRI owed $40,000 for cocaine

6  he purchased from UC2.

7    140. On July 9, 2013, in the parking lot of a store in

8  Rancho Cucamonga, California, defendant AISPURO told UC2 that he

9  knew the vehicle he would be driving to Utah contained cocaine

10  and asked whether the hidden compartment was well-built so that

11  the cocaine would not be discovered by law enforcement.

12    141. On July 9, 2013, defendant PANIRY followed defendant

13  AISPURO as defendant AISPURO drove a vehicle defendants PANIRY

14  and AISPURO believed contained cocaine from Rancho Cucamonga,

15  California, to St. George, Utah.

16    142. On July 9, 2013, defendant PANIRY delivered the

17  vehicle previously driven by defendant AISPURO to an individual

18  defendant PANIRY believed was a cocaine customer but who was, in

19  fact, an undercover agent with the Drug Enforcement

20  Administration ("UC5") in St. George, Utah.

21    143. On July 9, 2013, using coded language during a

22  telephone conversation, defendant MATSRI provided defendant

23  PANIRY with the telephone number of the drug customer that UC2

24  told defendant MATSRI owed $40,000 for cocaine he purchased from

25  UC2.  In the same telephone conversation, defendant MATSRI told

26  defendant PANIRY to call the drug customer after his car was

27  vandalized and to tell him that, if he failed to pay his cocaine

28

1   debt, what happened to his car would happen to his face.

2   Defendant MATSRI also told defendant PANIRY to ensure that

3   defendant PANIRY's telephone number was blocked when he made the

4   threatening telephone call to the drug customer.

5       144. On July 9, 2013, in the parking lot of an apartment

6   complex in Toluca Lake, California, defendant GOMEZ-NAVARRO used

7   a tire iron to vandalize the drug customer's vehicle, beating

8   the exterior of the vehicle, destroying the windows, and kicking

9   off the rear view mirrors.

10      145. On July 9, 2013, using coded language during a

11  telephone conversation, defendant MATSRI told UC2 that the drug

12  customer's car had been successfully vandalized and that

13  defendant MATSRI would soon arrange for a threatening telephone

14  call to be placed to the drug customer.

15      146. On July 9, 2013, defendant PANIRY placed a telephone

16  call to the telephone number for the drug customer that UC2 had

17  provided to defendant MATSRI and told the drug customer that if

18  he did not pay the debt, what had just happened to his vehicle

19  would happen to his face.

20      147. On July 9, 2013, using coded language during a

21  telephone conversation, defendant MATSRI told UC2 that a

22  threatening telephone call had been placed to the drug customer

23  to intimidate him into paying the debt defendant MATSRI believed

24  was owed to UC2 for a cocaine purchase.

25      148. On July 10, 2013, at a shopping mall in Montebello,

26  California, using coded language, defendant MATSRI asked UC1 and

27  UC2 if they were satisfied with the vandalism of the drug

28

customer's vehicle that defendant MATSRI had carried out and told UC1 and UC2 that he would force the drug customer to pay what he believed was a $40,000 drug debt in exchange for $5,000. During the same conversation, defendant MATSRI told UC2 that he would take over collection of the cocaine debt.

149. On July 10, 2013, at a shopping mall in Montebello, California, using coded language, defendant MATSRI agreed to arrange for the transportation of 10 kilograms of cocaine in a vehicle equipped with a hidden compartment in exchange for $1,000 per kilogram of cocaine he transported.

1              COUNT TWO

2           [18 U.S.C. § 1956(h)]

3  A.   OBJECTS OF THE CONSPIRACY

4       Beginning on an unknown date, and continuing until on or

5  about July 12, 2013, in Los Angeles County, within the Central

6  District of California, and elsewhere, defendants MOSHE MATSRI,

7  also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the

8  Religious" ("MATSRI"), YOUVAL GERINGER-GANOR, aka "Mike," aka

9  "The Disappointed One" ("GERINGER"), YARON COHEN, aka "Mike"

10 ("COHEN"), IBRAHIM OTER, aka "the Godfather" ("OTER"), and SHAY

11 PANIRY, aka "Alex," aka "Sacramento" ("PANIRY"), and others

12 known and unknown to the Grand Jury, conspired and agreed with

13 each other to knowingly and intentionally commit the following

14 offenses:

15      1.   Believing that property involved in a financial

16 transaction affecting interstate and foreign commerce

17 represented the proceeds of some form of unlawful activity, and

18 which property was believed to be the proceeds of specified

19 unlawful activity, namely, the felonious manufacture,

20 importation, receiving, concealment, buying, selling, and

21 otherwise dealing in a controlled substance punishable under any

22 law of the United States, as set forth in 18 U.S.C. § 1961(1)(D)

23 (hereinafter "felonious drug trafficking"), conduct and attempt

24 to conduct financial transactions: (a) with the intent to

25 promote the carrying on of said specified unlawful activity; and

26 (b) knowing that the transactions were designed in whole and in

27 part to conceal and disguise the nature, the location, the

28

                        35

1  source, the ownership, and the control of the proceeds of said
2  specified unlawful activity, in violation of Title 18, United
3  States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i);

4      2.  Transport, transmit, and transfer, and attempt to
5  transport, transmit, and transfer, monetary instruments and
6  funds to a place in the United States, that is, Los Angeles,
7  California, from a place outside the United States, that is,
8  Canada, Belgium, and the Netherlands, with the intent to promote
9  the carrying on of specified unlawful activity, namely,
10 felonious drug trafficking, and knowing that the monetary
11 instruments and funds involved in the transportation,
12 transmission, and transfer represented the proceeds of some form
13 of unlawful activity, and knowing that such transportation,
14 transmission, and transfer was designed in whole and in part to
15 conceal and disguise the nature, the location, the source, the
16 ownership, and the control of the proceeds of specified unlawful
17 activity, in violation of Title 18, United States Code, Sections
18 1956(a)(2)(A) and 1956(a)(2)(B)(i); and

19     3.  Engage and attempt to engage in monetary transactions
20 involving criminally derived property of a value greater than
21 $10,000, which property represented the proceeds of specified
22 unlawful activity, namely, felonious drug trafficking, in
23 violation of Title 18, United States Code, Section 1957(a).

24 B.  MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO
25     BE ACCOMPLISHED

26     The objects of the conspiracy were to be accomplished in
27 substance as follows:

28

1      1-9.   The Grand Jury re-alleges and incorporates by

2  reference as if fully set forth herein paragraphs 1 through 9,

3  Section B, of Count One, setting forth the means of the

4  conspiracy charged in Count One, as to defendants MATSRI,

5  GERINGER, COHEN, OTER, and PANIRY.

6  C.    OVERT ACTS

7     In furtherance of the conspiracy and to accomplish the

8  objects of the conspiracy, on or about the following dates,

9  defendants MATSRI, GERINGER, COHEN, OTER, and PANIRY, and others

10  known and unknown to the Grand Jury, committed various overt

11  acts within the Central District of California, and elsewhere,

12  including, but not limited to, the following:

13      1-149.   The Grand Jury re-alleges and incorporates by

14  reference as if fully set forth herein paragraphs 1 through 149,

15  Section C, of Count One, setting forth the overt acts of the

16  conspiracy charged in Count One, as to defendants MATSRI,

17  GERINGER, COHEN, OTER, and PANIRY.

COUNT THREE

[21 U.S.C. § 846]

A.   OBJECTS OF THE CONSPIRACY

Beginning on an unknown date and continuing until on or about July 12, 2013, in Los Angeles and San Bernardino Counties, within the Central District of California, and elsewhere, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious" ("MATSRI"), YOUVAL GERINGER-GANOR, aka "Mike," aka "The Disappointed One" ("GERINGER"), SHAY PANIRY, aka "Alex," aka "Sacramento" ("PANIRY"), HECTOR MIGUEL GOMEZ-NAVARRO ("GOMEZ-NAVARRO"), and EFRAIN AISPURO, JR. ("AISPURO"), and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally distribute, and possess with intent to distribute, a controlled substance, that is, at least five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(ii).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO
     BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished in substance as follows:

1-10. The Grand Jury re-alleges and incorporates by reference as if fully set forth herein paragraphs 4 through 13, Section B, of Count One, setting forth the means of the

conspiracy charged in Count One as to defendants MATSRI, GERINGER, PANIRY, GOMEZ-NAVARRO, and AISPURO.

11. Defendants PANIRY and GOMEZ-NAVARRO, acting on behalf of defendant MATSRI, would deliver money to drug traffickers to be used to purchase kilogram quantities of cocaine.

12. Defendant MATSRI would purchase multi-kilogram quantities of cocaine for resale to his customers located in Israel and the United States.

13. Defendant MATSRI would arrange for associates in Israel to receive shipments of cocaine at the Port of Haifa in Israel.

14. Defendants GERINGER, PANIRY, and GOMEZ-NAVARRO would obtain cocaine in Los Angeles, California, to enable defendant MATSRI to evaluate the quality of the cocaine he wanted to purchase for resale.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, on or about the following dates, defendants MATSRI, GERINGER, PANIRY, GOMEZ-NAVARRO, and AISPURO, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

1-28. The Grand Jury re-alleges and incorporates by reference as if fully set forth herein paragraphs 122 through 149, Section C, of Count One, setting forth the overt acts of the conspiracy charged in Count One as to defendants MATSRI, GERINGER, PANIRY, GOMEZ-NAVARRO, and AISPURO.

29.  On March 6, 2013, in the parking lot of a restaurant in Vernon, California, using coded language, defendant MATSRI told UC1 and UC2 that he wanted to purchase kilograms of cocaine from UC1 and UC2 at a price of approximately $4,500 per kilogram to be shipped from Panama to Israel where he had associates who would assist him in re-selling the cocaine.

30.  On April 10, 2013, using coded language during a telephone conversation, defendant MATSRI told UC1 that he wanted to purchase 10 kilograms of cocaine that would be shipped from Panama and resold by MATSRI in Israel.

31.  On April 17, 2013, at a restaurant in Los Angeles, California, using coded language, defendant MATSRI agreed to purchase 10 kilograms of cocaine from UC1 and UC2 that he planned to resell in Israel at a profit of $60,000 per kilogram and asked UC1 and UC2 to provide him with 100 kilograms of cocaine, which he offered to pay for once the cocaine had been sold to a client of his in New York.

32.  On April 17, 2013, using coded language during a telephone conversation, defendant GERINGER told UC1 that he should seriously consider defendant MATSRI's request for 100 kilograms of cocaine to resell to a customer in New York because the cocaine deal would generate large profits for UC1 and defendants MATSRI and GERINGER.

33. On May 2, 2013, at a fast food restaurant in Los Angeles, California, defendant MATSRI negotiated with UC1 and UC2 the purchase of ten kilograms of cocaine for resale in Israel for $80,000.

1      34.  On May 3, 2013, using coded language during a

2  telephone conversation, defendant MATSRI called an unindicted

3  co-conspirator, who was located in jail in Israel awaiting trial

4  on murder charges, and agreed that details of an impending

5  cocaine shipment that defendant MATSRI planned to send to Israel

6  would be worked out in the next week.  In the same telephone

7  conversation, defendant MATSRI told the unindicted co-

8  conspirator that he wanted to ensure that the people who would

9  receive the cocaine in Israel were organized.

10     35.  On May 8, 2013, at a restaurant in Vernon, California,

11  using coded language, defendant MATSRI told UC1 and UC2 that he

12  wanted to ship cocaine to Israel for resale every month and

13  would pay approximately $60,000 for each kilogram of cocaine he

14  sold in Israel on behalf of UC1 and UC2, separate and apart from

15  the cocaine MATSRI sold in Israel on his own behalf.

16     36.  On May 8, 2013, at a restaurant in Vernon, California,

17  using coded language, defendant MATSRI asked UC1 and UC2 for a

18  cocaine sample that represented the quality of cocaine he would

19  buy from UC1 and UC2 in larger quantities.  On the same day,

20  MATSRI also asked UC1 and UC2 whether they would be interested

21  in investing with him in a cocaine deal in Hong Kong.

22     37.  On May 8, 2013, using coded language during a

23  telephone conversation, defendant MATSRI told UC1 that he had

24  approximately $30,000 to provide to UC1 as partial payment for

25  the 10 kilograms of cocaine that he planned to resell in Israel.

26     38.  On May 8, 2013, using coded language during a

27  telephone conversation, defendant MATSRI told UC2 that he would

28

1  meet UC2 at a shopping mall in Montebello, California, to

2  deliver approximately $30,000 as a partial payment for the 10

3  kilograms of cocaine that he planned to resell in Israel.

4      39.   On May 8, 2013, using coded language during a

5  telephone conversation, defendant MATSRI requested defendant

6  PANIRY's assistance in delivering $30,000 to UC1 as a down

7  payment for the purchase of 10 kilograms of cocaine.

8      40.   On May 8, 2013, using coded language during a

9  telephone conversation, defendant MATSRI directed defendant

10 PANIRY to bring other people to assist in making the delivery of

11 $30,000 to UC1 as a down payment for the purchase of 10

12 kilograms of cocaine.

13     41.   On May 8, 2013, using coded language during a

14 telephone conversation, defendant MATSRI directed defendant

15 PANIRY to ensure that he had a hat available to wear as a

16 disguise during the upcoming delivery of $30,000 to UC1 that was

17 scheduled to occur later that day.

18     42.   On May 8, 2013, using coded language during a

19 telephone conversation, defendant MATSRI instructed defendant

20 PANIRY to oversee the payment of approximately $30,000 to UC3 as

21 partial payment for the 10 kilograms of cocaine that defendant

22 MATSRI planned to resell in Israel.

23     43.   On May 8, 2013, using coded language during a

24 telephone conversation, defendant MATSRI directed defendant

25 PANIRY to the location of UC3, who was waiting in the parking

26 lot of the Montebello shopping mall, to receive $30,000 as a

27 down payment for the purchase of 10 kilograms of cocaine.

28

44. On May 8, 2013, at a shopping mall in Montebello, California, defendant PANIRY directed defendant GOMEZ-NAVARRO to deliver approximately $30,000 to UC3 as partial payment for the 10 kilograms of cocaine that defendant MATSRI planned to resell in Israel.

45. On May 8, 2013, at a shopping mall in Montebello, California, defendant GOMEZ-NAVARRO received approximately $30,000 in cash from defendant PANIRY and delivered the money to UC3 as partial payment for the 10 kilograms of cocaine that defendant MATSRI planned to resell in Israel.

46. On May 9, 2013, using coded language during a telephone conversation, defendant MATSRI told UC2 that he would make an additional payment on May 13, 2013, for the 10 kilograms of cocaine that he planned to buy from UC1 and UC2.

47. On May 13, 2013, using coded language during a telephone conversation, defendant MATSRI told UC2 that he would provide a second partial payment later that day at the shopping mall in Montebello, California, for the 10 kilograms of cocaine he planned to buy from UC1 and UC2 and resell in Israel.

48. On May 13, 2013, using coded language during a telephone conversation, defendant MATSRI told UC2 that he would pay approximately $35,000 that day and approximately $15,000 the following week for the 10 kilograms of cocaine that he planned to buy from UC1 and UC2 and resell in Israel.

49. On May 13, 2013, in the parking lot of a restaurant in Vernon, California, defendants MATSRI and PANIRY provided UC2 with approximately $35,000 in cash as partial payment for the 10

1 kilograms of cocaine that defendant MATSRI planned to purchase

2 from UC1 and UC2.

3     50. On May 13, 2013, using coded language during a

4 telephone conversation, defendant MATSRI asked UC2 for a sample

5 of cocaine comparable to the quality of the cocaine he planned

6 to buy in larger quantities from UC1 and UC2 for resale in

7 Israel.

8     51. On May 21, 2013, using coded language during a

9 telephone conversation, defendant MATSRI told UC2 that defendant

10 MATSRI's associates would deliver the final payment for the 10

11 kilograms of cocaine he planned to buy from UC1 and UC2 and

12 resell in Israel to UC2's associate at a location next to a

13 particular store at the shopping mall in Montebello, California.

14     52. On May 21, 2013, in the parking lot of a shopping mall

15 in Montebello, California, defendant GOMEZ-NAVARRO, under the

16 supervision of defendant PANIRY, removed approximately $14,500

17 in cash from the trunk of defendant MATSRI's vehicle and

18 provided the money to UC3 as partial payment for the 10

19 kilograms of cocaine defendant MATSRI was in the process of

20 purchasing from UC1 and UC2.

21     53. On May 21, 2013, using coded language during a

22 telephone conversation, defendant MATSRI asked UC2 for a sample

23 of cocaine and told UC2 that he would arrange for an associate

24 to retrieve the sample the following week from UC2.

25     54. On June 7, 2013, using coded language during a

26 telephone conversation, defendant MATSRI told UC1 that he and

27 his associates in Israel would wait for the ship containing the

28

cocaine he planned to purchase from UC1 and resell in Israel to depart from a port in Miami, Florida.

55.   On June 7, 2013, using coded language during a telephone conversation, defendant MATSRI told UC1 that his drug trafficking associate in New York was interested in purchasing cocaine in Los Angeles if UC1 could transport the cocaine to New York for a low cost.

56.   On June 20, 2013, using coded language during a telephone conversation, defendant MATSRI told defendant GERINGER that defendant GERINGER needed to get in contact with UC2.

57.   On June 20, 2013, using coded language during a telephone conversation, defendant MATSRI confirmed with defendant PANIRY that defendant PANIRY had arrived at the shopping mall in Montebello, California, to assist defendant MATSRI in obtaining a cocaine sample.

58.   On June 20, 2013, at a shopping mall in Montebello, California, using coded language, defendant MATSRI told UC1 and UC2 that he had a customer in New York who was interested in purchasing approximately 100 kilograms of cocaine, which defendant MATSRI would buy from UC1 and UC2 and then resell to his customer if the cocaine was high quality.

59.   On June 20, 2013, using coded language during a telephone conversation, defendant MATSRI directed defendant PANIRY to tell defendant GOMEZ-NAVARRO to go to the entrance of the food court by a particular store in the shopping mall in Montebello, California, to obtain a cocaine sample from a courier.

1   60. On June 20, 2013, using coded language during a

2 telephone conversation, defendant PANIRY confirmed to defendant

3 MATSRI that defendant GOMEZ-NAVARRO would wait by the food court

4 of the shopping mall in Montebello, California, to receive a

5 sample of cocaine from a courier.

6   61. On June 20, 2013, in front of a shopping mall in

7 Montebello, California, defendant GOMEZ-NAVARRO received a

8 sample of cocaine, concealed in a coffee cup, from a courier and

9 provided the cocaine to defendant PANIRY.

10   62. On June 20, 2013, in front of a shopping mall in

11 Montebello, California, defendant PANIRY removed the sample of

12 cocaine from the coffee cup, inspected the cocaine, and then

13 returned the cocaine to defendant GOMEZ-NAVARRO.

14   63. On June 20, 2013, using coded language during a

15 telephone conversation, defendant PANIRY told defendant MATSRI

16 that the cocaine sample he had received from defendant GOMEZ-

17 NAVARRO looked to be of good quality.

18   64. On June 24, 2013, using coded language during a

19 telephone conversation, defendant MATSRI discussed with an

20 unindicted co-conspirator that he wanted a person who did not

21 look suspicious to pick up 10 kilograms of cocaine that

22 defendant MATSRI had arranged to purchase from UC1 and have

23 delivered to Israel.

24   65. On July 8, 2013, using coded language during a

25 telephone conversation, defendant MATSRI told defendant PANIRY

26 that he met with UC2 earlier in the day and that the

27

28

1   transportation of cocaine from the Los Angeles area to Utah was

2   scheduled to occur the next day.

3       66.   On July 9, 2013, using coded language during a

4   telephone conversation, defendants MATSRI and PANIRY coordinated

5   details about the trip they arranged for that day in which

6   defendant AISPURO agreed to drive cocaine from the Los Angeles

7   area to Utah.

8       67.   On July 10, 2013, at a shopping mall in Montebello,

9   California, using coded language, defendant MATSRI asked UC1 and

10   UC2 to provide him with another sample of cocaine because he had

11   two cocaine customers who were both willing to purchase up to

12   100 kilograms of cocaine but wanted assurances on the quality of

13   the cocaine.

14       68.   On July 10, 2013, at a shopping mall in Montebello,

15   California, using coded language, defendant MATSRI told UC1 and

16   UC2 that he would arrange for an associate in Israel to receive

17   the 10 kilograms of cocaine to be shipped to the Port of Haifa

18   in Israel (hereinafter "co-conspirator #6).

19       69.   On July 10, 2013, at a shopping mall in Montebello,

20   California, using coded language, defendant MATSRI told UC2 that

21   he would send defendant GERINGER to pick up five kilograms of

22   cocaine on July 12, 2013, so that, if the cocaine was of high

23   quality, a transaction for between 50 and 100 kilograms of

24   cocaine could be arranged in the following days with one of

25   MATSRI's drug customers.

26       70.   On July 12, 2013, using coded language during a

27   telephone conversation, defendant MATSRI told UC2 that defendant

28

1   GERINGER had arrived at a pre-arranged location to meet with an
2   individual defendants MATSRI and GERINGER believed would provide
3   them with five kilograms of cocaine but who was, in fact, a
4   confidential source working with law enforcement (hereinafter
5   the "CS").

6       71.  On July 12, 2013, at a restaurant in Montebello,
7   California, using coded language, defendant MATSRI told UC1 and
8   UC2 that he had over $200,000 in stolen merchandise belonging to
9   an Armenian drug trafficking associate that he could sell to pay
10  UC1 and UC2 for the five kilograms of cocaine that defendant
11  GERINGER was going to retrieve from the CS on MATSRI's behalf.

12      72.  On July 12, 2013, using coded language during a
13  telephone conversation, defendant GERINGER told defendant MATSRI
14  that he had arrived at the pre-arranged location to meet with
15  the CS in preparation for receiving five kilograms of cocaine.

16      73.  On July 12, 2013, defendant GERINGER traveled to a
17  warehouse in North Hollywood, California, where he received five
18  kilograms of cocaine on behalf of defendant MATSRI.

19      74.  On July 12, 2013, in a coded text message, after
20  receiving five kilograms of cocaine at a warehouse in North
21  Hollywood, California, defendant GERINGER told defendant MATSRI
22  that he had successfully obtained the cocaine.

23
24
25
26
27
28

COUNTS FOUR through SIX

[18 U.S.C. §§ 1956(a)(2)(A), (B)(i)]

On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant YARON COHEN, also known as "Mike," transported, transmitted, and transferred the monetary instruments and funds set forth below to a place in the United States, that is, Los Angeles, California, from a place outside the United States, that is, the Netherlands, with the intent to promote the carrying on of specified unlawful activity, namely, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under any law of the United States, as set forth in 18 U.S.C. § 1961(1)(D), and knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, as represented by a law enforcement officer:

| COUNT | DATE | FUNDS TRANSFERRED |
|-------|------|-------------------|
| FOUR | November 15, 2012 | $78,416 |
| FIVE | November 23, 2012 | $162,801 |
| SIX | March 1, 2013 | $216,435 |

COUNTS SEVEN through NINE

[18 U.S.C. §§ 1956(a)(3)(A), (B)]

On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant YARON COHEN, also known as "Mike" ("COHEN"), with the intent to promote the carrying on of specified unlawful activity, namely, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under any law of the United States, as set forth in 18 U.S.C. § 1961(1)(D), and with the intent to conceal and disguise the nature, location, source, ownership, and control of property that defendant COHEN believed to be the proceeds of said specified unlawful activity, conducted financial transactions involving property set forth below represented to be the proceeds of said specified unlawful activity:

| COUNT | DATE | PROPERTY |
|-------|------|----------|
| SEVEN | November 15, 2012 | $78,416 |
| EIGHT | November 23, 2012 | $162,801 |
| NINE | March 1, 2013 | $216,435 |

COUNT TEN

[18 U.S.C. §§ 1956(a)(3)(A), (B); 2(a)]

On or about December 19, 2012, in Los Angeles County, within the Central District of California, and elsewhere, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious" ("MATSRI"), YOUVAL GERINGER-GANOR, aka "Mike," aka "The Disappointed One" ("GERINGER"), YARON COHEN, aka "Mike" ("COHEN"), and SHAY PANIRY, aka "Alex," aka "Sacramento" ("PANIRY"), each intentionally aiding and abetting the other, with the intent to promote the carrying on of specified unlawful activity, namely, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under any law of the United States, as set forth in 18 U.S.C. § 1961(1)(D), and with the intent to conceal and disguise the nature, location, source, ownership, and control of property that defendants MATSRI, GERINGER, COHEN, and PANIRY believed to be the proceeds of said specified unlawful activity, conducted a financial transaction involving property, that is, approximately $70,510, represented to be the proceeds of said specified unlawful activity.

1             COUNTS ELEVEN through FOURTEEN

2          [18 U.S.C. §§ 1956(a)(3)(A), (B); 2(a)]

3      On or about the dates set forth below, in Los Angeles

4  County, within the Central District of California, and

5  elsewhere, defendants MOSHE MATSRI, also known as ("aka") "Jim,"

6  aka "Moshe Hatadi," aka "Moshe the Religious" ("MATSRI"), and

7  YOUVAL GERINGER-GANOR, aka "Mike," aka "The Disappointed One"

8  ("GERINGER"), each intentionally aiding and abetting the other,

9  with the intent to promote the carrying on of specified unlawful

10  activity, namely, the felonious manufacture, importation,

11  receiving, concealment, buying, selling, and otherwise dealing

12  in a controlled substance punishable under any law of the United

13  States, as set forth in 18 U.S.C. § 1961(1)(D), and with the

14  intent to conceal and disguise the nature, location, source,

15  ownership, and control of property that defendants MATSRI and

16  GERINGER believed to be the proceeds of said specified unlawful

17  activity, conducted financial transactions involving property

18  set forth below represented to be the proceeds of said specified

19  unlawful activity:

| COUNT | DATE | PROPERTY |
|---|---|---|
| ELEVEN | February 1, 2013 | $83,140 |
| TWELVE | February 5, 2013 | $49,982 |
| THIRTEEN | February 7, 2013 | $101,860 |
| FOURTEEN | March 29, 2013 | $128,100 |

1    COUNTS FIFTEEN and SIXTEEN

2    [18 U.S.C. §§ 1956(a)(2)(A), (B)(i); 2(a)]

3    On or about the dates set forth below, in Los Angeles

4    County, within the Central District of California, and

5    elsewhere, defendants MOSHE MATSRI, also known as ("aka") "Jim,"

6    aka "Moshe Hatadi," aka "Moshe the Religious," YOUVAL GERINGER-

7    GANOR, aka "Mike," aka "The Disappointed One," and SHAY PANIRY,

8    aka "Alex," aka "Sacramento," each intentionally aiding and

9    abetting the other, transported, transmitted, and transferred

10   the monetary instruments and funds set forth below, to a place

11   in the United States, that is, Los Angeles, California, from a

12   place outside the United States, that is, Canada, with the

13   intent to promote the carrying on of specified unlawful

14   activity, namely, the felonious manufacture, importation,

15   receiving, concealment, buying, selling, and otherwise dealing

16   in a controlled substance punishable under any law of the United

17   States, as set forth in 18 U.S.C. § 1961(1)(D), and knowing that

18   the monetary instruments and funds involved in the

19   transportation, transmission, and transfer were represented to

20   be the proceeds of some form of unlawful activity, and knowing

21   that such transportation, transmission, and transfer was

22   designed in whole and in part to conceal and disguise the

23   ///

24   ///

25   ///

26   ///

27   ///

28

53

nature, the location, the source, the ownership, and the control
of the proceeds of specified unlawful activity, as represented
by a law enforcement officer:

| COUNT | DATE | FUNDS TRANSFERRED |
|-------|------|-------------------|
| FIFTEEN | February 15, 2013 | $85,000 |
| SIXTEEN | February 22, 2013 | $87,500 |

COUNTS SEVENTEEN and EIGHTEEN

[18 U.S.C. §§ 1956(a)(3)(A), (B); 2(a)]

On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious" ("MATSRI"), YOUVAL GERINGER-GANOR, aka "Mike," aka "The Disappointed One" ("GERINGER"), and SHAY PANIRY, aka "Alex," aka "Sacramento" ("PANIRY"), each intentionally aiding and abetting the other, with the intent to promote the carrying on of specified unlawful activity, namely, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under any law of the United States, as set forth in 18 U.S.C. § 1961(1)(D), and with the intent to conceal and disguise the nature, location, source, ownership, and control of property that defendants MATSRI, GERINGER, and PANIRY believed to be the proceeds of said specified unlawful activity, conducted financial transactions involving property set forth below represented to be the proceeds of said specified unlawful activity:

| COUNT | DATE | PROPERTY |
|-------|------|----------|
| SEVENTEEN | February 15, 2013 | $85,000 |
| EIGHTEEN | February 22, 2013 | $87,500 |

55

COUNT NINETEEN

[18 U.S.C. §§ 1956(a)(2)(A), (B)(i); 2(a)]

On or about March 29, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious," and YOUVAL GERINGER-GANOR, aka "Mike," aka "The Disappointed One," each intentionally aiding and abetting the other, transported, transmitted, and transferred monetary instruments and funds, namely, approximately $128,100, to a place in the United States, that is Los Angeles, California, from a place outside the United States, that is, Belgium, with the intent to promote the carrying on of specified unlawful activity, namely, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under any law of the United States, as set forth in 18 U.S.C. § 1961(1)(D), and knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, as represented by a law enforcement officer.

COUNT TWENTY

[18 U.S.C. §§ 1956(a)(2)(A), (B)(i); 2(a)]

On or about April 9, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious," YARON COHEN, aka "Mike," and IBRAHIM OTER, aka "the Godfather," each intentionally aiding and abetting the other, transported, transmitted, and transferred monetary instruments and funds, namely, approximately $141,740, to a place in the United States, that is Los Angeles, California, from a place outside the United States, that is, Belgium, with the intent to promote the carrying on of specified unlawful activity, namely, the felonious manufacture, importation, receiving, concealment, buying, selling, and otherwise dealing in a controlled substance punishable under any law of the United States, as set forth in 18 U.S.C. § 1961(1)(D), and knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, as represented by a law enforcement officer.

1          COUNT TWENTY-ONE

2      [18 U.S.C. §§ 1956(a)(3)(A), (B); 2(a)]

3          On or about April 9, 2013, in Los Angeles County, within

4  the Central District of California, and elsewhere, defendants

5  MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi,"

6  aka "Moshe the Religious" ("MATSRI"), YARON COHEN, aka "Mike"

7  ("COHEN"), and IBRAHIM OTER, aka "the Godfather" ("OTER"), each

8  intentionally aiding and abetting the other, with the intent to

9  promote the carrying on of specified unlawful activity, namely,

10  the felonious manufacture, importation, receiving, concealment,

11  buying, selling, and otherwise dealing in a controlled substance

12  punishable under any law of the United States, as set forth in

13  18 U.S.C. § 1961(1)(D), and with the intent to conceal and

14  disguise the nature, location, source, ownership, and control of

15  property that defendants MATSRI, COHEN, and OTER believed to be

16  the proceeds of said specified unlawful activity, conducted a

17  financial transaction involving property, namely, approximately

18  $141,740, represented to be the proceeds of said specified

19  unlawful activity.

20

21

22

23

24

25

26

27

28

1  COUNT TWENTY-TWO

2  [21 U.S.C. § 846]

3      On or about July 9, 2013, in San Bernardino County, within

4  the Central District of California, and elsewhere, defendants

5  MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi,"

6  aka "Moshe the Religious," SHAY PANIRY, aka "Alex," aka

7  "Sacramento," and EFRAIN AISPURO, JR., knowingly and

8  intentionally attempted to distribute at least five kilograms of

9  a mixture and substance containing a detectable amount of

10  cocaine, a Schedule II narcotic drug controlled substance, in

11  violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWENTY-THREE

[21 U.S.C. § 846]

On or about July 12, 2013, in Los Angeles County, within the Central District of California, and elsewhere, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious," and YOUVAL GERINGER-GANOR, aka "Mike," aka "The Disappointed One," knowingly and intentionally attempted to possess with intent to distribute at least five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II narcotic drug controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(ii).

1                          COUNT TWENTY-FOUR

2                        [18 U.S.C. § 1951(a)]

3   A.   OBJECT OF THE CONSPIRACY

4        Beginning on or about August 2, 2012, and continuing to on

5   or about May 14, 2013, in Los Angeles County, within the Central

6   District of California, and elsewhere, defendants MOSHE MATSRI,

7   also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the

8   Religious" ("MATSRI"), and NISIM SABAG, aka "Nesi Sabag"

9   ("SABAG"), together with others known and unknown to the Grand

10  Jury, conspired and agreed with each other to knowingly and

11  intentionally obstruct, delay, and affect commerce and the

12  movement of articles and commodities in commerce, by extortion,

13  that is, the obtaining of property from victims H.J.K. and

14  H.J.Y., with the victims' consent, induced by the wrongful use

15  of actual and threatened force, violence, and fear, in violation

16  of Title 18, United States Code, Section 1951.

17  B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

18       ACCOMPLISHED

19       The object of the conspiracy was to be accomplished in

20  substance as follows:

21       1.   At all times material to this Indictment, victims

22  H.J.K. and H.J.Y. operated businesses in Los Angeles,

23  California, which used goods and services derived from outside

24  California, and which engaged in commerce, as that term is

25  defined in Title 18, United States Code, Section 1951.

26

27

28
                                61

1     2.   Defendants MATSRI and SABAG would confront victims

2 H.J.K. and H.J.Y. and use actual and threatened force, violence,

3 and fear to obtain money from victims H.J.K and H.J.Y.

4 C.   OVERT ACTS

5     In furtherance of the conspiracy and to accomplish the

6 object of the conspiracy, defendants MATSRI and SABAG, and

7 others known and unknown to the Grand Jury, committed various

8 overt acts within the Central District of California, including,

9 but not limited to, the following:

10     1.   On or about August 3, 2012, defendants MATSRI and

11 SABAG held victim H.J.K. captive in a locked car for several

12 hours, demanded that H.J.K. pay defendants MATSRI and SABAG

13 $1,700, and threatened to come to H.J.K.'s home to collect

14 payment.

15     2.   On or about August 3, 2012, defendant SABAG told

16 victim H.J.K. that H.J.K. had until the following day to pay

17 $1,700.

18     3.   On an unknown date between on or about August 3, 2012

19 and August 9, 2012, defendant SABAG called victim H.J.K. to

20 demand that H.J.K. pay defendant SABAG $17,000.

21     4.   On or about August 8, 2012, at a meeting with victims

22 H.J.K. and H.J.Y. in H.J.Y.'s office, defendant SABAG assaulted

23 H.J.K., striking him in the face multiple times and choking him,

24 and demanded payment of $17,000.

25     5.   On or about August 8, 2012, defendants MATSRI and

26 SABAG slashed the tires of victim H.J.Y.'s cars.

27

28

1      6.   On or about August 9, 2012, defendant SABAG sent

2  victim H.J.K. a text message with an address in Los Angeles near

3  H.J.K.'s home and a second text message saying "We on the way."

4      7.   On or about August 9, 2012, in response to an August

5  8, 2012 text message from victim H.J.Y. asking defendant SABAG

6  to "Stop intimidation!!!," defendant SABAG sent H.J.Y. a text

7  message containing a photo of H.J.Y., taken without H.J.Y.'s

8  knowledge or consent, on the street outside of his business.

9      8.   On or about August 11, 2012, in an alley on Paloma

10  Street in Los Angeles, California, defendant MATSRI blocked

11  victim H.J.Y.'s car to prevent H.J.Y. from leaving while

12  defendant SABAG attacked H.J.Y. with a Taser.

13      9.   On or about March 25, 2013, defendant SABAG met with

14  victim H.J.Y. at a restaurant in Los Angeles, California, and

15  demanded that H.J.Y. pay the $1,700 victim H.J.K. purportedly

16  owed SABAG by the end of March.

17     10.  On or about March 29, 2013, defendant SABAG called

18  victim H.J.Y. and demanded payment of the $1,700 by April 2,

19  2013.

20     11.  On or about May 14, 2013, defendant SABAG threatened

21  victim H.J.Y. with harm if victim H.J.Y. continued to do

22  business in a particular area of downtown Los Angeles,

23  California.

24

25

26

27

28

COUNT TWENTY-FIVE

[18 U.S.C. §§ 1951(a); 2(a)]

On or about August 3, 2012, in Los Angeles County, within the Central District of California, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious" ("MATSRI"), and NISIM SABAG, aka "Nesi Sabag" ("SABAG"), each intentionally aiding and abetting one another, knowingly attempted to intentionally obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951. Specifically, defendants MATSRI and SABAG knowingly attempted to obtain $1,700 from victim H.J.K., with his consent, induced by the wrongful use of actual and threatened force, violence, and fear, namely, by holding H.J.K. captive for several hours and threatening to go to H.J.K.'s home to collect payment.

COUNT TWENTY-SIX

[18 U.S.C. § 1951(a)]

On or about August 8, 2012, in Los Angeles County, within the Central District of California, defendant NISIM SABAG, aka "Nesi Sabag" ("SABAG"), knowingly attempted to intentionally obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, Specifically, defendant SABAG knowingly attempted to obtain $17,000 from victim H.J.K., with his consent, induced by the wrongful use of actual and threatened force, violence, and fear, namely, by striking H.J.K. in the face and choking H.J.K.

COUNT TWENTY-SEVEN

[18 U.S.C. §§ 1951(a); 2(a)]

On or about August 11, 2012, in Los Angeles County, within the Central District of California, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious" ("MATSRI"), and NISIM SABAG, aka "Nesi Sabag" ("SABAG"), each intentionally aiding and abetting one another, knowingly attempted to intentionally obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951.  Specifically, defendants MATSRI and SABAG knowingly attempted to obtain $1700 from victim H.J.Y., with his consent, induced by the wrongful use of actual and threatened force, violence, and fear, namely, by attacking H.J.Y. with a Taser.

COUNT TWENTY-EIGHT

[18 U.S.C. § 1951(a)]

On or about March 25, 2013, in Los Angeles County, within the Central District of California, defendant NISIM SABAG, also known as "Nesi Sabag" ("SABAG"), knowingly attempted to intentionally obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, that is, defendant SABAG knowingly attempted to obtain $1,700 from victim H.J.Y., with his consent, induced by the wrongful use of threatened force, violence, and fear.

COUNT TWENTY-NINE

[18 U.S.C. § 1951(a)]

On or about March 29, 2013, in Los Angeles County, within the Central District of California, defendant NISIM SABAG, also known as "Nesi Sabag" ("SABAG"), knowingly attempted to intentionally obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, that is, defendant SABAG knowingly attempted to obtain $1,700 from victim H.J.Y., with his consent, induced by the wrongful use of threatened force, violence, and fear.

1        COUNT THIRTY

2        [18 U.S.C. § 1951(a)]

3   A.   OBJECT OF THE CONSPIRACY

4        Beginning on or about July 8, 2013, and continuing to on or

5   about July 12, 2013, in Los Angeles County, within the Central

6   District of California, and elsewhere, defendants MOSHE MATSRI,

7   also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the

8   Religious" ("MATSRI"), SHAY PANIRY, aka "Alex," aka "Sacramento"

9   ("PANIRY"), and HECTOR MIGUEL GOMEZ-NAVARRO ("GOMEZ-NAVARRO"),

10  together with others known and unknown to the Grand Jury,

11  conspired and agreed with each other to knowingly and

12  intentionally obstruct, delay, and affect commerce and the

13  movement of articles and commodities in commerce, by extortion,

14  that is, the obtaining of property from an individual, with the

15  individual's consent, induced by the wrongful use of actual and

16  threatened force, violence, and fear, in violation of Title 18,

17  United States Code, Section 1951.

18  B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

19       ACCOMPLISHED

20       The object of the conspiracy was to be accomplished in

21  substance as follows:

22       1-2. The Grand Jury re-alleges and incorporates by

23  reference as if fully set forth herein paragraphs 10 and 11,

24  Section B, of Count One, setting forth the means of the

25  conspiracy charged in Count One, as to defendants MATSRI,

26  PANIRY, and GOMEZ-NAVARRO.

27

28

1  C.    OVERT ACTS

2       In furtherance of the conspiracy and to accomplish the

3  object of the conspiracy, defendants MATSRI, PANIRY, and GOMEZ-

4  NAVARRO, and others known and unknown to the Grand Jury,

5  committed various overt acts within the Central District of

6  California, including, but not limited to, the following:

7       1-9. The Grand Jury re-alleges and incorporates by

8  reference as if fully set forth herein paragraphs 136-137, 139,

9  143-148, Section C, of Count One, setting forth the overt acts

10 of the conspiracy charged in Count One, as to defendants MATSRI,

11 PANIRY, and GOMEZ-NAVARRO.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT THIRTY-ONE

[18 U.S.C. §§ 1951(a); 2(a)]

On or about July 9, 2013, in Los Angeles County, within the Central District of California, defendants MOSHE MATSRI, also known as ("aka") "Jim," aka "Moshe Hatadi," aka "Moshe the Religious" ("MATSRI"), SHAY PANIRY, aka "Alex," "Sacramento" ("PANIRY"), and HECTOR MIGUEL GOMEZ-NAVARRO ("GOMEZ-NAVARRO"), each intentionally aiding and abetting one another, knowingly attempted to intentionally obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951, that is, defendants MATSRI, PANIRY, and GOMEZ-NAVARRO knowingly attempted to obtain $40,000 from an

///
///
///
///
///
///
///
///
///
///
///
///
///
///

1    individual, with his consent, induced by the wrongful use of

2    actual and threatened force, violence, and fear.

3

4                                        A TRUE BILL

5

6                                        _/s/_____

7                                        Foreperson

8    ANDRÉ BIROTTE JR.
9    United States Attorney

10

ROBERT E. DUGDALE
11   Assistant United States Attorney
     Chief, Criminal Division
12

13   RODRIGO A. CASTRO-SILVA
     Assistant United States Attorney
14   Chief, Organized Crime Drug Enforcement
        Task Force Section
15

16   ELIZABETH R. YANG
     Assistant United States Attorney
17   Chief, Violent and Organized Crime Section

18   ROB B. VILLEZA
     Assistant United States Attorney
19   Deputy Chief, Organized Crime Drug Enforcement
        Task Force Section
20

21   MICHAEL J. STERN
     Assistant United States Attorney
22   Violent and Organized Crime Section

23   NICHOLAS A. PILGRIM
     Assistant United States Attorney
24   Organized Crime Drug Enforcement
        Task Force Section
25

26   ROBYN K. BACON
     Assistant United States Attorney
27   Violent and Organized Crime Section

28
                            72